UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 16-10255-GAO-2

UNITED STATES OF AMERICA,
Plaintiff,

v.

CARLOS REYES,
Defendant.

OPINION AND ORDER
April 9, 2018

O'TOOLE, D.J.

The defendant, Carlos Reyes, is charged with conspiracy to possess with intent to distribute a controlled substance in violation of 21 U.S.C. § 846 and possession with intent to distribute a controlled substance in violation of 21 U.S.C. § 841(a)(1). Currently pending before the Court is the defendant's motion to suppress the evidence related to these charges pursuant to Federal Rule of Criminal Procedure 12(b)(3)(C).

As a matter of general background, it is not disputed that on the evening of July 18, 2016, a Massachusetts State Trooper stopped the defendant's car on Hammond Pond Parkway in Brookline, Massachusetts, conducted a warrantless search of the car, and seized cocaine from its trunk. The arrest report states that the defendant was stopped for committing a traffic violation and that the search was conducted after receiving consent. The defendant now moves to suppress the evidence seized from his vehicle as well as the statements he made to an officer during the search. He asserts in his affidavit that he did not commit any traffic violation that would have justified stopping him nor did he give consent to the search. Consequently, he argues that there was no valid

basis for the stop and search, and that his detention during the stop was a de facto arrest that required Miranda warnings.

The Court held an evidentiary hearing on January 10, 2018, receiving testimony from Massachusetts State Police Troopers Dennis Lynch ("Trooper Lynch") and Keith Pantazelos ("Trooper Pantazelos"), and exhibits from both parties. The facts described below are based on that testimonial and documentary evidence.[1]

The defendant first asserts that he did not commit any traffic violation and that the police did not otherwise have any basis for the stop. However, I find as a factual matter the defendant did commit traffic violations of tailgating and speeding. Both Troopers Lynch and Pantazelos testified that they witnessed the defendant tailgating a white pickup truck. Trooper Lynch also "clocked" the defendant shortly thereafter and estimated that he was traveling at sixty miles per hour in a forty mile-per-hour zone. This gave Trooper Lynch probable cause to stop the defendant for those traffic violations even if doing so was "just an excuse to investigate something else." See United States v. McGregor, 650 F.3d 813, 820 (1st Cir. 2011). Accordingly, the stop was not unreasonable.

The defendant next asserts that he did not consent to the search of his vehicle and that the Troopers did not otherwise have probable cause to do so. It is well-established that "a warrantless search may be conducted with the voluntary consent of a person authorized to give it." United

---

[1] The defendant did not testify at the evidentiary hearing and, consequently, was not subjected to cross-examination on the contents of his affidavit. The Court, therefore, has the discretion to strike the affidavit. See United States v. Baskin, 424 F.3d 1, 3 (1st Cir. 2005). However, because the Court credits the Troopers' testimony concerning the disputed issues, it chooses instead to give the affidavit consideration, but little weight. See, e.g., United States v. Herrera, Criminal Action No. 17-CR-10112-ADB, 2018 WL 1020112, at *2 n.6 (D. Mass. Feb. 22, 2018); United States v. Ramos, 591 F. Supp. 2d 93, 113–14 (D. Mass. 2008); United States v. Sanchez, 535 F. Supp. 2d 216, 218, 224 n.8 (D. Mass. 2008).

States v. Stierhoff, 549 F.3d 19, 23 (1st Cir. 2008) (citing Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973)). The scope of consent is determined by what an objective observer would think was reasonable based on the exchange. United States v. Melendez, 301 F.3d 27, 32 (1st Cir. 2002). Both the voluntariness and scope of a consent are assessed in the totality of the circumstances. Id.; United States v. Hinkley, 803 F.3d 85, 91 (1st Cir. 2015).

Here, I find that the defendant did, in fact, consent to the search of his vehicle—twice—and that the actual search did not exceed the scope of consent that was given. Based on the testimony of Trooper Lynch, which I find credible, the defendant gave voluntary consent first while sitting in the driver's seat and again after being asked to step outside of the vehicle. Though the defendant was not informed that he could refuse consent, such specific advice is not required for consent to be valid. United States v. Jones, 523 F.3d 31, 38 (1st Cir. 2008) ("We have repeatedly held that the failure to advise a defendant of his right to refuse consent does not automatically render such consent invalid." (citations omitted)). Moreover, as a forty-six year-old veteran of the criminal justice system, the defendant was less likely to be intimidated by Trooper Lynch's request, see United States v. Chaney, 647 F.3d 401, 408 (1st Cir. 2011) ("It is reasonable to infer that a veteran of the criminal justice system will be 'less likely than most to be intimidated by the agents' show of force.'" (quoting United States v. Barnett, 989 F.2d 546, 556 (1st Cir. 1993))), which was not accompanied by any coercive show of force that might invalidate the consent, cf. Jones, 523 F.3d 31, 38 (1st Cir. 2008) (finding circumstances of consent were not coercive where "some ten to fifteen government agents, guns drawn, entered [defendant's] hotel suite without knocking, handcuffed him, placed him in a separate room, and proceeded to interrogate him"). Accordingly, I find that the defendant "appreciated the significance of giving

consent." See Jones, 523 F.3d at 38. There is a difference between giving consent happily and giving it voluntarily. I find the consent to have been voluntary on both occasions.[2]

Trooper Lynch asked Reyes for permission to search "his vehicle." (Evid. Hr'g Tr., 26: 10–11, 29: 2–7 (dkt. no. 83).) In the absence of any specific exclusion from this general request, this is reasonably understood to mean the entire vehicle, including the trunk where, eventually, a drug-sniffing dog alerted to cocaine hidden in the package in the trunk. There was no evidence that the defendant ever protested or otherwise attempted to limit the scope of his consent, even as he watched the search take place.[3] See United States v. Forbes, 181 F.3d 1, 6 (1st Cir. 1999) ("[I]t is reasonable to construe [the defendant's] consent to search the automobile as encompassing consent to search the trunk."); United States v. Zapata, 18 F.3d 971, 977 (1st Cir. 1994) (citing Florida v. Jimeno, 500 U.S. 248, 251–52 (1991)) (upholding search of duffel bag in trunk of vehicle and stating "[i]t is . . . well settled that a general consent to search a motor vehicle subsumes the specific consent to search any easily accessible containers within the vehicle"). Because the defendant voluntarily consented to the search of his vehicle, including the trunk, the search was reasonable under the Fourth Amendment and the items seized from the vehicle will not be suppressed.

Lastly, the defendant argues that, because he was handcuffed and placed in the back of Trooper Lynch's cruiser before any contraband was found, the investigatory stop was elevated to a de facto arrest. If that were true, then any questioning of him would have been a custodial

---

[2] Because I find that the defendant voluntarily gave consent, there is no need to address whether law enforcement had probable cause to conduct the warrantless search.
[3] The defendant does not make any argument that it was unreasonable for the Troopers to open the Girl Scout Cookie Oven box after it had been alerted-to by the narcotics-trained dog.

interrogation requiring Miranda warnings. He did not receive those warnings until after the drugs were discovered and he was formally arrested.

In distinguishing between temporary investigatory detention and de facto arrest, courts consider the totality of the circumstances and determine whether a reasonable person would have understood the defendant's position "to be tantamount to arrest." Chaney, 647 F.3d at 409 (quoting Zapata, 18 F.3d at 975). This requires consideration of, among other things, "the length of the detention, the restrictions placed on an individual's personal movement, the force (if any) that was exerted, the information conveyed to the detainee, and the severity of the intrusion." United States v. Pontoo, 666 F.3d 20, 30 (1st Cir. 2011) (quoting United States v. Sowers, 136 F.3d 24, 28 (1st Cir.1998)).

Generally, a justified investigatory stop will not be judged a de facto arrest so long as "the actions undertaken by the officers following the stop were reasonably responsive to the circumstances justifying the stop in the first place as augmented by information gleaned by officers during the stop." Chaney, 647 F.3d at 409 (quoting United States v. Trueber, 238 F.3d 79, 92 (1st Cir. 2001)). Law enforcement officers engaged in an otherwise lawful stop "must be permitted to take measures . . . they believe reasonably necessary to protect themselves from harm, or to safeguard the security of others." Id. (alteration in original) (quoting United States v. Acosta-Colon, 157 F.3d 9, 18 (1st Cir. 1998).

The use of handcuffs is one such measure that, despite being a traditional indicium of arrest, may nevertheless be used as part of an investigatory detention when there is "some specific fact or circumstance that could have supported a reasonable belief that the use of such restrains was necessary to carry out the legitimate purposes of the stop without exposing law enforcement officers, the public, or the suspect himself to undue risk of harm." Id. (quoting Acosta-Colon, 157

F.3d at 18–19); see also United States v. Fornia-Castillo, 408 F.3d 52, 64 (1st Cir. 2005) ("[N]either the use of handcuffs nor the drawing of a weapon necessarily transforms a valid Terry stop into a de facto arrest."). In the present case, the facts and circumstances both supported the use of such restraints.

As a participant in the ongoing drug trafficking investigation, Trooper Lynch was aware of certain facts regarding the defendant that raised legitimate safety concerns. Specifically, Lynch was aware of the defendant's criminal record, which included a significant prison term for a federal drug trafficking conviction as well as state convictions for firearms and narcotics offenses, assault and battery with a dangerous weapon, and, notably, assault and battery on a police officer. See United States v. Rasberry, 882 F.3d 241, 248 (1st Cir. 2018) (noting that criminal history of suspected drug trafficker heightened concerns of officer safety and justified the prophylactic drawing of weapons and use of handcuffs); Chaney, 647 F.3d at 410 (same). These concerns were heightened by the similarity between the defendant's criminal history and the ongoing drug trafficking investigation in which he was now implicated. See United States v. Arnott, 758 F.3d 40, 45 (1st Cir. 2014) ("The connection between drugs and violence is, of course, legendary.").

With respect to the circumstances, the stop occurred on a public road with brisk, consistent traffic, and Trooper Lynch was effectively alone in attending to the defendant throughout the stop even after the arrival of the drug dog because the dog's handler, Trooper McSweeney, was occupied with paying attention to the actions of the dog, not to Reyes. See United States v. Rabbia, 699 F.3d 85, 92 (1st Cir. 2012) (holding no de facto arrest despite the use of handcuffs by officer who was "effectively alone in confronting [the defendant]"); Fornia-Castillo, 408 F.3d 65 (holding no de facto arrest where stop occurred on busy public street and lone officer handcuffed the

defendant for fifteen minutes). Additionally, while handcuffing the defendant, Trooper Lynch informed him that he was not under arrest, but was only being handcuffed for safety reasons and because a dog was arriving on scene. See Rabbia, 699 F.3d at 93 (noting that defendant was informed that he was not under arrest); Pontoo, 666 F.3d at 30 (noting that "information conveyed to the detainee" is relevant in assessing de facto arrest). In sum, Trooper Lynch's use of handcuffs was reasonably necessary to mitigate legitimate safety concerns presented by the specific facts and circumstances of the stop and the search.

Nor did the duration of the stop transform this investigatory detention into de factor arrest. "The appropriate length of a Terry stop is gauged by whether the officer diligently pursued a reasonable investigative approach calculated to ensure officer safety and, at the same time, confirm or dispel his suspicions." Pontoo, 666 F.3d at 31 (citing United States v. Sharpe, 470 U.S. 675, 685–86 (1985)). Based on the testimony of both Troopers, which is corroborated by the turret tape metadata, the time between the defendant's first consent to search and his arrest was approximately twenty-three minutes. The defendant was handcuffed, but explicitly not arrested, for approximately nineteen of these twenty-three minutes.[4] And though the defendant was put in the back of a police cruiser, the door was open except for a short period time while Trooper Lynch

---

[4] The turret tape metadata and testimony of both Troopers establish that the stop occurred at approximately 7:43 p.m., (Evid. Hr'g Tr., 112: 10–16), with Trooper Lynch requesting the canine unit at approximately 7: 46 p.m. after receiving the defendant's first consent to search, (id., 62: 11–13; Turret Metadata, 1 (dkt. no. 80)). Trooper Lynch testified that the canine operator, Trooper McSweeney, was on scene less than five minutes after his request, at approximately 7:50 p.m. (Evid. Hr'g Tr., 28: 22–24.) It was not until Trooper McSweeney arrived at the scene that the defendant was handcuffed, (id., 63: 2–8), and he was only formally arrested and advised of his Miranda rights after the drugs were discovered in the Girl Scout Cookie Oven, at approximately 8:09 p.m., (id., 35: 10–12; Turret Metadata, 1). The entire stop prior to arrest lasted approximately twenty-six minutes. The defendant consented to the search of his vehicle approximately three minutes into the stop, and was in handcuffs, but not arrested, for approximately nineteen of the twenty-three minutes following his consent.

spoke to Trooper McSweeney just before Trooper McSweeney conducted a safety inspection of the vehicle to ensure there were no objects that might harm the dog during its search. After this, Trooper Lynch returned to the cruiser and opened the door so he could observe the defendant while the search was being conducted.

It was not unreasonable for the troopers to temporarily close the door to the cruiser in order for them to focus on safely, quickly, and efficiently executing the search using the dog, and there is no contention that the Troopers were otherwise dilatory in a way that would make the search unreasonably prolonged. At bottom, neither the duration of the stop generally nor the duration of confinement in the cruiser was unreasonable under the circumstances. See, e.g., United States v. Owens, 167 F.3d 739, 749 (1st Cir. 1999) (finding fifty-minute detention did not amount to de facto arrest under the circumstances); United States v. McCarthy, 77 F.3d 522, 531 (1st Cir. 1996) (finding seventy-five minute detention was not de facto arrest where officers were diligently investigating).

The government has met its burden of establishing that the stop and warrantless search of the defendant were reasonable under the Fourth Amendment, and that the investigatory detention of the defendant did not amount to a de facto arrest. Accordingly, neither the physical evidence nor the defendant's statements during the execution of the search will be suppressed.

For the reasons stated, the defendant's Motion to Suppress Statements and Physical Evidence (dkt. no. 63) is DENIED.

It is SO ORDERED.

/s/ George A. O'Toole, Jr.
United States District Judge